UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAYMOND MONTERO,

                         Plaintiff,

      v.

THE CITY OF YONKERS, NEW YORK;
KEITH OLSON, in his official and individual
capacities; BRIAN MORAN, in his official
and individual capacities; JOHN MUELLER,
in his official and individual capacities,

                       Defendants.

No. 15-CV-4327 (KMK)

OPINION & ORDER

Appearances

Christopher Dale Watkins, Esq.
Michael Howard Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiff*

Clifford James Bond, Esq.
Clifford J. Bond, Attorney at Law
White Plains, NY
*Counsel for Plaintiff*

John A. Sarcone, III, Esq.
The Sarcone Law Firm, PLLC
White Plains, NY
*Counsel for Plaintiff*

John Martin Flannery, Esq.
Lalit Kumar Loomba, Esq.
Peter Alexander Meisels, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
Stamford, CT
*Counsel for Defendants the City of Yonkers, Brian Moran, and John Mueller*

Andrew C. Quinn, Esq.
The Quinn Law Firm, PLLC

White Plains, NY
*Counsel for Defendant Keith Olson*

KENNETH M. KARAS, District Judge:

Detective Raymond Montero ("Plaintiff") brought this suit pursuant to 42 U.S.C. § 1983 alleging that Defendants retaliated against him in violation of his First Amendment rights for comments he made at two meetings held by the Police Association of the City of Yonkers, Inc., also known as the Yonkers Police Benevolent Association (the "Yonkers PBA").  (*See* Am. Compl. (Dkt. No. 20).)  Defendants have moved to dismiss the Amended Complaint. Specifically, Defendants the City of Yonkers, Brian Moran, and John Mueller (the "City Defendants") have moved to dismiss on the grounds that Plaintiff has failed to state a claim for retaliation in violation of the First Amendment, Moran and Mueller are entitled to qualified immunity, and Plaintiff has failed to state a claim for municipal liability.  (*See* Mem. of Law in Supp. of Mot. To Dismiss Am. Compl. ("City Defs.' Mem.") (Dkt. No. 28).)  Defendant Olson has moved to dismiss on the ground that Plaintiff has failed to state a claim for retaliation in violation of the First Amendment.  (*See* Mem. of Law in Supp. of Def. Olson's Mot. To Dismiss Pursuant to F.R.C.P. Rule 12(b)(6) ("Olson's Mem.") (Dkt. No. 31).)  For the reasons to follow, Defendants' Motions are granted.

## I.  Background

### A.  Factual Background

Because this case is before the Court on several motions to dismiss, the Court accepts as true all factual allegations in Plaintiff's Amended Complaint for the purpose of deciding the Motions.

Plaintiff is a police officer with the City of Yonkers Police Department (the "Department").  (*See* Am. Compl. ¶ 3.)  In January 2010, Plaintiff ran for vice president of the

2

Yonkers PBA and Olson ran for president.  (*See id.* ¶¶ 11, 13.)  Plaintiff defeated Olson's friend and preferred candidate, Michael Farina, and was elected vice president; Olson was elected president.  (*See id.* ¶¶ 12–13.)

During a Yonkers PBA meeting held in June 2010, Plaintiff criticized then-Police Commissioner Edmund Hartnett for cutting several police units, arguing that the cuts were bad for the police force, the Yonkers PBA, and the community.  (*See id.* ¶¶ 16–17.)  Plaintiff expressed that he intended to call for a vote of no confidence in Commissioner Hartnett at the next general meeting of the Yonkers PBA.  (*See id.* ¶ 17.)  Olson was in favor of the cuts implemented by Commissioner Hartnett.  (*See id.* ¶ 18.)  Shortly thereafter, in July 2010, then-Lieutenant Mueller spoke to Plaintiff in Mueller's office and told him that Commissioner Hartnett did not like what Plaintiff had been saying about the Commissioner and others.  (*See id.* ¶ 19.)  Mueller instructed Plaintiff to stop speaking negatively about the Yonkers PBA, Commissioner Hartnett, or the mayor, and told Plaintiff that if he continued to make negative comments, he would be transferred out of his current post in the Special Investigations Unit. (*See id.*)

Notwithstanding Mueller's warning, in February 2011, Plaintiff called for a vote of no confidence in Commissioner Hartnett.  (*See id.* ¶ 20.)  Although the Amended Complaint does not indicate where Plaintiff called for the vote, the Parties' briefing makes clear that Plaintiff called for the vote at a meeting of the Yonkers PBA.  (*See* City Defs.' Mem. 3; Pl.'s Mem. of Law in Opp'n to Defs.' Mots. To Dismiss ("Pl.'s Mem.") 2 (Dkt. No. 32).)

One month later, in March 2011, Olson—along with Mueller and Moran, both close personal friends of Olson—conducted an unauthorized investigation into Plaintiff's submission of overtime slips.  (*See* Am. Compl. ¶¶ 15, 21.)  Plaintiff alleges that any such investigation

should have been conducted by the Internal Affairs Division.  (*Id.*)  Plaintiff further alleges that during the course of the investigation, Olson, Mueller, and Moran "falsely and maliciously accused Plaintiff of intentionally submitting false overtime slips."  (*Id.* ¶ 23.)  As a result of the investigation, the Department stripped Plaintiff of 40 hours of compensatory time and issued Plaintiff a disciplinary write-up.  (*Id.* ¶ 24.)

That same month, Moran, purporting to act on the instructions of Mueller, ordered Plaintiff to transfer out of the Special Investigations Unit and ordered Plaintiff to submit a transfer request to that effect.  (*Id.* ¶ 25.)  In April 2011, Plaintiff was transferred out of the Special Investigations Unit and into the Detective Division.  (*Id.* ¶ 26.)  Plaintiff alleges that the transfer was retaliation for his activity in the Yonkers PBA and served as a functional demotion because the Special Investigations Unit is "an elite and highly desirable unit."  (*Id.* ¶ 27.)  As a result of the transfer, Plaintiff also lost overtime pay because he was punitively assigned to desk duty.  (*Id.*)  In May 2011, Plaintiff alleges that Olson admitted that Plaintiff had been written up, stripped of compensatory time, and transferred to a lesser position because of Plaintiff's criticism of Olson's leadership of the Yonkers PBA and of Commissioner Hartnett's management of the Department.  (*Id.* ¶ 28.)

In September 2011, after he learned that Plaintiff intended to run against him for Yonkers PBA president, Olson verbally confronted Plaintiff, calling him a "fucking pussy" and telling Plaintiff that Olson should "kick his ass."  (*Id.* ¶ 29.)  Olson was in part frustrated because Plaintiff had refused to debate Olson in advance of the election.  (*Id.*)  That same month, Plaintiff's office was vandalized, and pictures of the Cowardly Lion from "The Wizard of Oz" were posted in Plaintiff's office.  (*Id.* ¶ 30.)  Plaintiff alleges that the vandalism came at the hands of Olson, either directly or at his instruction.  (*Id.* ¶ 31.)  Also in September 2011, Mueller

conducted another unauthorized investigation into Plaintiff, this time about alleged insubordination by Plaintiff.  (*Id.* ¶ 32.)  Plaintiff reported Olson's threats and the vandalism of his office to the Internal Affairs Division, but no investigation was undertaken.  (*Id.* ¶ 33.)

In January 2012, Olson, Mueller, Moran, and another police officer conducted a second unauthorized investigation of Plaintiff.  (*Id.* ¶ 34.)  Moran instructed the fourth police officer to confiscate security footage from a building in which Plaintiff had been, and Moran himself took photographs of Plaintiff's truck and police placard.  (*Id.* ¶ 35.)  The purpose of the investigation was to show that Plaintiff was outside of his home without authorization while on sick leave. (*Id.* ¶ 36.)  Plaintiff alleges that any such investigation should have been conducted by the Department's Medical Control Unit, and that Plaintiff did, in fact, have permission to be outside of his home while on sick leave.  (*Id.* ¶¶ 37–38.)  The Department nonetheless docked Plaintiff two days' salary for the alleged infraction.  (*Id.* ¶ 39.)

In January 2012, Plaintiff was transferred to the Gangs Unit.  (*Id.* ¶ 40.)  He remained in that unit until at least the filing of the Amended Complaint on October 13, 2015.  (*Id.*)  Because of Plaintiff's placement in the Detective Division, where Moran is a detective-sergeant, Plaintiff has lost many hours of overtime pay.  (*Id.* ¶ 41.)  Also in January 2012, Plaintiff ran against Olson for president of the Yonkers PBA.  (*Id.* ¶ 42.)  Olson won the election, though Plaintiff alleges that Olson used smear tactics and intimidation, "as well as a distinct specter of fraud," to win the election.  (*Id.*)

In August 2012, Olson met with Plaintiff's commanding officer, Detective-Sergeant Michael Kivel, and stated, "Who the fuck does Montero think he is by not talking?  He better be fucking careful."  (*Id.* ¶ 43.)  Plaintiff alleges that this comment was made in reference to Plaintiff's failure to acknowledge Olson and Moran while he was visiting a sick police officer.

(*Id.*)  Kivel relayed this threat to Plaintiff, who thereafter reported it to the Internal Affairs Division.  (*Id.* ¶ 44.)  The Internal Affairs Division took no action to investigate the threat.  (*Id.*)

Plaintiff further alleges that Defendants have targeted those who associate with Plaintiff as retaliation for Plaintiff's union activity.  (*Id.* ¶ 45.)  For instance, in April 2013, Olson and Moran conducted an unauthorized investigation of Detective Captain Itzla because Itzla had refused to discipline Plaintiff for alleged wrongdoing and because Itzla had recommended disciplinary action against Moran.  (*Id.* ¶ 46.)  In July 2013, Olson told a civilian employee that she would have problems on the job if she continued to associate with Plaintiff.  (*Id.* ¶ 47.)

In September 2013, Olson sent Plaintiff a text asking Plaintiff to meet Olson "in another jurisdiction and preferably off duty."  (*Id.* ¶ 50.)  Plaintiff interpreted this as a threat and reported it to the Internal Affairs Division, but no action was taken in response.  (*Id.* ¶ 51.)

At one point in time, Olson complained to Commissioner Hartnett and the mayor about comments on the *Yonkers Tribune* website that were critical of the leadership of the Yonkers PBA.  (*Id.* ¶ 48.)  As a result, the Department instructed the Intelligence Unit to monitor the *Yonkers Tribune* website.  (*Id.* ¶ 49.)  Shortly thereafter, in October 2013, Olson "compelled" the Internal Affairs Division to investigate Plaintiff for alleged communications with a reporter for the *Yonkers Tribune*.  (*Id.* ¶ 52.)  The Department did, in fact, investigate Plaintiff, and told Plaintiff that he would be terminated if he did not reveal whether he had spoken with the reporter.  (*Id.* ¶ 53.)

That November, several high-ranking officers in the Department advised the City of Yonkers' corporation counsel that Plaintiff was the subject of harassment and negative treatment because of his opposition to Olson.  (*Id.* ¶ 55.)  No action was taken in response.  (*Id.*)

In January 2014, at a Yonkers PBA meeting, Olson called for Plaintiff's expulsion from the Yonkers PBA.  (*Id.* ¶ 56.)  Plaintiff attempted to leave the meeting in apparent protest, but William Pataky, one of Olson's associates and a union trustee, blocked Plaintiff from leaving and made verbal threats to Plaintiff.  (*Id.* ¶ 57.)  Thereafter, "some shoving and pushing ensued between Plaintiff and Pataky."  (*Id.* ¶ 58.)  After the meeting, Olson conducted an unauthorized investigation into the incident.  (*Id.* ¶ 59.)  As part of that investigation, Olson directed other police officers to seize videotapes from the facility where the meeting was held.  (*Id.* ¶ 60.)  The Internal Affairs Division investigated Olson's seizure of the videotapes and recommended that Olson be disciplined; however, the Department did not discipline Olson.  (*Id.* ¶¶ 61–62.)

Following the January meeting, Olson prepared a petition calling for Plaintiff to be expelled from the Yonkers PBA.  (*Id.* ¶ 63.)  Plaintiff alleges that the petition falsely accused him of providing information to local newspapers and of punching Pataky during the January 2014 meeting.  (*Id.* ¶¶ 64–65.)  The Department permitted Olson to post copies of the petition throughout various precincts.  (*Id.* ¶ 68.)

Around February 2014, Mueller urged Police Chief William Cave to remove Plaintiff from his position as the Department's representative at the weekly County-wide Intelligence meetings.  (*Id.* ¶ 69.)  Cave agreed, removing Plaintiff from his position and putting Pataky in his place.  (*Id.* ¶¶ 71–72.)  Plaintiff alleges that he lost 24 hours of pay per month as a result of this action.  (*Id.* ¶ 73.)  In June 2014, at Olson's urging, Plaintiff was expelled from the Yonkers PBA.  (*Id.* ¶ 74.)

In approximately July 2014, there was a break-in at the Gang Unit's office where Plaintiff worked.  (*Id.* ¶ 76.)  Plaintiff's shield, which he had left on the desk in his office, was taken.  (*Id.* ¶ 78.)  The Internal Affairs Division did not investigate the break-in.  (*Id.* ¶ 79.)

Shortly thereafter, Moran claimed to have been given Plaintiff's shield by someone who found it on a street in Yonkers. (*Id.* ¶ 80.) Moran wrote a report stating that Plaintiff's shield had been lost, with the alleged intent to cause Plaintiff to be disciplined for losing his shield. (*Id.* ¶ 81.) No disciplinary action was taken against Plaintiff. (*Id.* ¶ 82.)

In addition to the above allegations, Plaintiff also alleges that the Department, "through its final policymaking officials," has aided Defendants in their retaliation against Plaintiff. (*Id.* ¶ 85.) Plaintiff also alleges that the Department "has adopted an unwritten policy to aid Olson, Mueller[,] and Moran in retaliating against Plaintiff because of his union activity." (*Id.* ¶ 86.)

B. Procedural Background

Plaintiff filed his Complaint on June 4, 2015. (*See* Compl. (Dkt. No. 1).) Following a conference, (*see* Dkt. (minute entry for Sept. 9, 2015)), the Court entered an order setting forth the schedule for Plaintiff's Amended Complaint, (*see* Scheduling Order (Dkt. No. 17)). Plaintiff filed his Amended Complaint on October 13, 2015. (*See* Am. Compl. (Dkt. No. 20).) Following another conference, (*see* Dkt. (minute entry for Dec. 16, 2015)), the Court entered a briefing schedule for Defendants' Motions To Dismiss, (*see* Scheduling Order (Dkt. No. 25)). Pursuant to the Court's Order, all Parties filed their Motions and supporting papers on March 4, 2016. (*See* Dkt. Nos. 26–34.) The Parties submitted supplemental letters discussing a recently-decided Second Circuit case. (*See* Dkt. Nos. 35–37.) The Court held oral argument on December 8, 2016. (*See* Dkt. (minute entry for Dec. 8, 2016).)

II. Discussion

A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992

F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

### B.  Discussion

All Defendants move for dismissal on the ground that Plaintiff has failed to state a claim for retaliation in violation of the First Amendment.  Mueller and Moran additionally argue that they are entitled to qualified immunity, and the City of Yonkers argues that Plaintiff has failed to adequately plead municipal liability.  Because the issue of whether Plaintiff has stated a claim under the First Amendment may be dispositive of the case, the Court will address that question first.

### 1.  Applicable Law

"In adjudicating the rights of public employees to speak without facing retaliation from a government employer," the Second Circuit has recently explained that "courts attempt 'to arrive at a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"  *Lynch v. Ackley*, 811 F.3d 569, 577 (2d Cir. 2016) (alteration omitted) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  In so doing, "[c]ourts must weigh the employee's speech interests against the government's interest in 'effective and efficient fulfillment of its responsibilities to the public, including promoting

efficiency and integrity in the discharge of official duties, and maintaining proper discipline in public service.'" *Id.* (alterations omitted) (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014)).

To that end, a plaintiff asserting a First Amendment retaliation claim must plausibly allege that "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011). To determine whether a public employee's speech is protected, the Court must engage in a two-step inquiry. First, the Court must determine "whether the employee spoke as a citizen on a matter of public concern." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). Within this first step, the Court must consider two additional subquestions: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Id.* (some internal quotation marks omitted). "If the answer to either question is no, that is the end of the matter." *Id.* "If, however, both questions are answered in the affirmative, the [C]ourt then proceeds to the second step of the inquiry," where it asks "whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'" *Id.* (quoting *Lane*, 134 S. Ct. at 2380).

At this stage, the Parties dispute only whether Plaintiff's speech or conduct was protected under the First Amendment and whether any of Defendants took an adverse action against him. With regard to whether Plaintiff's speech or conduct was protected, the Parties do not reach the

second step of the inquiry, and address only whether Plaintiff spoke as a private citizen on a matter of public concern.

### 2.  Private Citizen Speaking on Public Concern

The Parties dispute both whether Plaintiff spoke as a private citizen and whether he spoke on a matter of public concern.  Plaintiff seems to admit that the only speech at issue that could give rise to protection under the First Amendment is his comments at the Yonkers PBA meetings criticizing Commissioner Hartnett's management of the Department.  (*See* Pl.'s Mem. 11 ("[S]peech made by a public union official at a union meeting which is critical of management is core union activity, and thus protected.").[1]  Because the Court concludes that Plaintiff did not speak as a private citizen, it need address only that issue.

In *Matthews*, the Second Circuit, relying on the Supreme Court's decision in *Garcetti*, held that in determining whether a public employee speaks as a citizen for First Amendment purposes, the Court must ask: "(A) did the speech fall outside of the employee's 'official responsibilities,' and (B) does a civilian analogue exist?"  779 F.3d at 173.

The inquiry into whether a public employee spoke pursuant to his or her official duties is "a practical one."  *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 202

---

[1] Earlier in the litigation, Plaintiff appeared poised to argue that statements he allegedly made to two local newspapers were also protected speech.  (*See* Letter from Clifford J. Bond, Esq., to Court (Aug. 11, 2015) (Dkt. No. 11).)  He has apparently abandoned that argument.  (*See generally* Pl.'s Mem.)

Separately, Plaintiff contended at oral argument that ¶ 15 of the Amended Complaint identifies other instances of First Amendment speech that may have been protected.  But ¶ 15 alleges only that "[f]rom January 2010 through January 2012, as Yonkers PBA Vice President, Plaintiff criticized Olson's leadership of the Yonkers PBA."  (Am. Compl. ¶ 15.)  This allegation offers no details on where these statements were made and, when pressed at oral argument, Plaintiff's counsel offered no specifics.  Such a broad statement, devoid of any specifics, fails to sufficiently allege protected speech.  *Cf. Kempkes v. Downey*, No. 07-CV-1298, 2008 WL 852765, at *4 (S.D.N.Y. Mar. 31, 2008) (finding insufficient the plaintiff's "general allegations of unspecified protected speech").

(2d Cir. 2010) (internal quotation marks omitted).  In making this determination, courts in the Second Circuit "focus[] on the subject, manner, and context of the speech to determine whether it relates to topics that are indispensable prerequisites to effective performance of the speaker's primary employment responsibility, and thus not entitled to First Amendment protection." *Dillon v. Suffolk Cty. Dep't of Health Servs.*, 917 F. Supp. 2d 196, 208–09 (E.D.N.Y. 2013) (internal quotation marks omitted); *see also Hagan v. City of New York*, 39 F. Supp. 3d 481, 511 (S.D.N.Y. 2014) (holding that courts should consider whether "it is fair to say that the employer would reasonably expect the expression and is therefore entitled to exercise control over its form and content").  Speech may be pursuant to a public employee's official job duties "even though it is not required by, or included in, the employee's job description, or in response to a request by the employer."  *Weintraub*, 593 F.3d at 203.

The Parties do not discuss whether Plaintiff's statements were made pursuant to his official duties.  At this stage, the record does not contain any document showing what Plaintiff's official duties entailed, and thus the Court cannot say whether Plaintiff's duties at the Department were directly related to the comments made at the two Yonkers PBA meetings.  However, in *Weintraub*, the Second Circuit made clear that speech may be pursuant to a public employee's official duties so long as it is "'part-and-parcel of his concerns' about his ability to 'properly execute his duties,'" 593 F.3d at 203 (quoting *Williams v. Dall. Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007)), and clarified that an employee's job description is not dispositive of this question, *see id.* at 202–03.

Moreover, some courts have dismissed claims similar to Plaintiff's on the ground that comments by police officers regarding disputes with departmental policy or perceived issues in the administration of the department are "part-and-parcel" of their official duties, insofar as

management of the department impacts their ability to carry out their official duties.  *See Peone v. County of Ontario*, No. 12-CV-6012, 2013 WL 775358, at *8 (W.D.N.Y. Feb. 28, 2013) (dismissing a claim where the plaintiff police officer had "complained . . . that [a superior] was interfering with [his] ability to do [his] job[]" because "[i]n the context of [the plaintiff's] employment, such complaints are not protected speech"); *Roman v. Velleca*, No. 11-CV-1867, 2012 WL 4445475, at *9 (D. Conn. Sept. 25, 2012) (dismissing a claim because "the [p]laintiff, a [d]etective in the Major Crimes Unit, does not have First Amendment protection for his speech where he spoke out in protest against the manner in which the Unit was being operated," and noting that the complaint was "clear that [the] [p]laintiff's alleged speech was made in his capacity as a police officer and not as a citizen"); *see also Carter v. Incorporated Village of Ocean Beach*, 693 F. Supp. 2d 203, 211 (E.D.N.Y. 2010) (granting summary judgment to the defendants where "[a]ll of [the] plaintiffs' complaints to their superiors . . . related to their concerns about their ability to properly execute their duties as police officers"), *aff'd*, 415 F. App'x 290 (2d Cir. 2011).  And unlike the plaintiff in *Matthews*, who offered "policy-oriented speech" that was "neither part of his job description nor part of the practical reality of his everyday work," 779 F.3d at 174, there is at least some indication in the Amended Complaint that Plaintiff believed the cuts to which he objected would affect the day-to-day operations of police officers, (*see* Am. Compl. ¶ 17 ("Plaintiff stated that the cuts were bad for the police force, bad for members of the PBA[,] and bad for the community.")).

Nevertheless, the Court is not persuaded that the mere fact that the criticisms of Commissioner Hartnett may have related in some tangential way to Plaintiff's daily workload is dispositive of the issue.  Unlike the comments made by the plaintiff in *Weintraub*, which related to the plaintiff's daily task of managing the students in his classroom, Plaintiff's complaints

about the management of the Department are only generally related to his daily tasks.  *See Garcetti*, 547 U.S. at 421 (noting that although the speech at issue "concerned the subject matter of [the plaintiff's] employment, . . . this, too, [was] nondispositive" because "[t]he First Amendment protects some expressions related to the speaker's job").  The Amended Complaint goes no further than to say that Plaintiff was concerned that the cuts proposed by Commissioner Hartnett would be detrimental to the Department and to the Yonkers PBA—it does not indicate what specific impact the cuts would have on Plaintiff.  Accordingly, while the Court finds it relevant that Plaintiff spoke on issues related to the management of the Department, that determination is far from dispositive.

More critical in this case is whether a civilian analogue exists.  The Second Circuit has explained that "[s]peech has a 'relevant civilian analogue' if it is made through 'channels available to citizens generally.'"  *Matthews*, 779 F.3d at 175 (quoting *Jackler v. Byrne*, 658 F.3d 225, 238 (2d Cir. 2011)).  While the lack of a civilian analogue is "not dispositive," "it does bear on the perspective of the speaker—whether the public employee is speaking as a citizen—which is the central issue."  *Weintraub*, 593 F.3d at 204 (internal quotation marks omitted).

The Second Circuit has offered some guidance on how to determine whether a civilian analogue exists, and four cases in particular shed some light on the issue.

In *Weintraub*, the plaintiff was a public school teacher who had filed a grievance through his union expressing displeasure with the school's failure to discipline a student who had allegedly assaulted him.  593 F.3d at 198–99.  The Second Circuit concluded that there was no civilian analogue, and no First Amendment protection, because "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens," and emphasized that "[r]ather than voicing his grievance through channels available to citizens

generally, [the plaintiff] made an internal communication pursuant to an existing dispute-resolution policy established by his employer." *Id.* at 204.  The Second Circuit added that the plaintiff "could only speak in the manner that he did by filing a grievance with his teacher's union as a public employee," and that "[h]is grievance filing, therefore, lacked a relevant analogue to citizen speech and 'retained no possibility' of constitutional protection." *Id.* (alteration omitted) (quoting *Garcetti*, 547 U.S. at 423).

In *Jackler*, the plaintiff, a police officer, had refused to withdraw or alter, at the request of his supervisors, a supplemental report that cast a member of the police department in a negative light.  658 F.3d at 231.  The Second Circuit thought it "clear" that the plaintiff's refusal to file a false report had a civilian analogue because "a citizen has a First Amendment right to decide what to say and what not to say, and, accordingly, the right to reject governmental efforts to require him to make statements he believes are false." *Id.* at 241.  The court pointed out that one "indicium that speech by a public employee has a civilian analogue is that the employee's speech was to 'an independent state agency' responsible for entertaining complaints by 'any citizen in a democratic society regardless of his status as a public employee," and observed that "[a] police department plainly is such an agency." *Id.* (some internal quotation marks omitted) (quoting *Weintraub*, 593 F.3d at 204).  The court then went on to conclude that "a citizen who has truthfully reported a crime has the indisputable right to reject pressure from the police to have him rescind his accusation and falsely exculpate the accused." *Id.*

The Second Circuit again addressed the issue in *Ross v. Breslin*, 693 F.3d 300 (2d Cir. 2012).  There, the plaintiff complained to her supervisor's boss and an outside consultant about allegedly improper disbursements being made. *Id.* at 303.  The Second Circuit instructed that in determining whether a plaintiff was speaking as a private citizen, "[c]ourts must examine the

nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship

between the two," adding that "[o]ther contextual factors, such as whether the complaint was

also conveyed to the public, may properly influence a court's decision." *Id.* at 306. The Second

Circuit held that because the plaintiff's testimony "ma[de] plain that reporting pay irregularities

to a supervisor was one of her job duties," her statements were not entitled to First Amendment

protection. *Id.* But the Second Circuit went on to "emphasize that [its] holding that [the

plaintiff's] speech was unprotected d[id] not rest on the fact that her speech was made in the

workplace as opposed to elsewhere," because "[s]peech to a supervisor even in the workplace

can be protected as that of a private citizen if it is not made pursuant to the employee's official

duties as an employee." *Id.* at 307.

Finally, in *Matthews*, the plaintiff, a police officer, spoke with his superiors and

expressed his concern that an arrest quota policy was damaging the police department's core

mission. 779 F.3d at 169–70. The Second Circuit, enunciating for the first time the two

inquiries relevant to deciding whether a public employee was speaking as a private citizen,

determined that a civilian analogue did exist in that case because the plaintiff "chose a path that

was available to ordinary citizens who are regularly provided the opportunity to raise issues with

the [p]recinct commanders." *Id.* at 176. The court pointed to facts showing that one of the

plaintiff's supervisors regularly attended monthly community council meetings (open to

members of the community), and another supervisor met with members of the community three

times a month to discuss issues in the precinct. *Id.* The Second Circuit dismissed the district

court's conclusion that no civilian analogue existed because the plaintiff "could speak to the

officers 'more readily, more frequently, and more privately than could an average citizen,'"

saying that it did "not consider the relative degree of access to be material; rather what matters is

whether the same or a similar channel exists for the ordinary citizen." *Id.* (quoting *Matthews v. City of New York*, 957 F. Supp. 2d 442, 465 (S.D.N.Y. 2013)).

Defendants argue here that because the Yonkers PBA meetings were closed to the general public, Plaintiff's mode of speech had no civilian analogue.  Plaintiff did not allege that the Yonkers PBA meetings were public, and assuming Defendants' assertion that the meetings were closed to the public, which Plaintiff admitted at oral argument and does not dispute in his papers, is accurate, then Defendants are correct that this is not a case where "a public employee [took] his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace." *Carter*, 693 F. Supp. 2d at 211 (internal quotation marks omitted).  Nor is this an instance where a plaintiff "made . . . statements as 'internal communications' between employee and supervisor." *Dingle v. City of New York*, No. 10-CV-4, 2011 WL 2682110, at *5 (S.D.N.Y. July 7, 2011) (footnote omitted).  The circumstances here, instead, are more akin to those in *Weintraub*, where the plaintiff communicated his grievance with management through the union.  *See* 593 F.3d at 199.  As the Second Circuit stated there, "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens."  *Id.* at 204; *see also Whitehead v. City of New York*, 953 F. Supp. 2d 367, 376 (E.D.N.Y. 2012) ("[The] plaintiff's participation in the quota policy arbitration is not protected by the First Amendment because he did not publicly testify and was only able to participate in the arbitration because of his position as a police officer.").  A public employee, it follows, "[is] not speaking as a private citizen in communications with his union representative." *Dingle*, 2011 WL 2682110, at *6.  While Plaintiff did not communicate with his union representative in the same way the plaintiff in *Weintraub* did, it is undisputed that Plaintiff's

complaints about management, like those levied in *Weintraub*, were made exclusively in a closed forum to a union official.

Plaintiff objects that in *Weintraub*, the plaintiff's "grievance was not protected activity because it was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties, as a public school teacher.'"  (Pl.'s Mem. 12–13 (alteration omitted) (quoting *Weintraub*, 593 F.3d at 203).)  Though this observation is partially correct, it addresses only one of the two considerations that inform whether a public employee speaks as a private citizen: whether the speech addressed issues within the employee's official responsibilities.  *See Matthews*, 779 F.3d at 175.  Plaintiff does not argue that the portion of *Weintraub*, cited by Defendants, concerning whether a civilian analogue mode of speech exists is inapposite here.  And although *Weintraub* involved the filing of a grievance—whereas here, Plaintiff vocalized his criticisms at a union meeting—this distinction is immaterial: both the plaintiff in *Weintraub* and Plaintiff here expressed their displeasure with management through their union in a forum not available for use by ordinary citizens.  Indeed, both here and in *Weintraub*, ordinary citizens were not even permitted to listen in on or otherwise gain access to the complaints levied.

Additionally, the only court to address this precise issue has concluded that speaking out at a closed union meeting does not implicate the First Amendment.  *See Nadolecki v. William Floyd Union Free Sch. Dist.*, No. 15-CV-2915, 2016 WL 4768823, at *7 (E.D.N.Y. July 6, 2016) (dismissing complaint where the plaintiff's comments "were . . . all made through official communications and established institutional channels" and the plaintiff "made complaints at [u]nion meetings which only teachers were invited to" (internal citations and quotation marks omitted)), *adopted by* 2016 WL 4766268 (E.D.N.Y. Sept. 13, 2016); *cf. Brady v. County of Suffolk*, 657 F. Supp. 2d 331, 344 (E.D.N.Y. 2009) (noting as relevant the fact that the plaintiff

had made the statements at issue only "verbally during [two] meetings" and directed them "to the supervisors who were present at the meetings").  In light of the factual similarities between the grievance filed in *Weintraub* and the complaints asserted here, the lack of public access to the Yonkers PBA meetings, and the lack of any allegations suggesting that public citizens could have aired their grievances regarding management of the Department in the same way Plaintiff did, the Court holds that Plaintiff's exercise of speech here did not have a civilian analogue.

This conclusion, however, does not resolve the case, as the Second Circuit instructed in *Weintraub* that the lack of a civilian analogue is "not dispositive."  *Weintraub*, 593 F.3d at 204; *see also Carter*, 693 F. Supp. 2d at 212 ("No one factor has been found to be dispositive in ascertaining whether a public employee was speaking as a citizen for First Amendment purposes.").  Complicating this inquiry is the fact that in *Weintraub*, where the Second Circuit held that no First Amendment protection was afforded to the plaintiff's speech, the court concluded that the public employee there was speaking on issues related to their official responsibilities *and* that there was no available civilian analogue.  *See* 593 F.3d at 203 (holding that the plaintiff's "speech challenging the school administration's decision to not discipline a student in his class was a means to fulfill, and undertaken in the course of performing, his primary employment responsibility of teaching," and adding that its conclusion on this point was "supported by the fact that [the plaintiff's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue" (citations and internal quotation marks omitted)).  And courts in the Second Circuit are split about whether *Matthews*, which clarified the two-part inquiry, abrogated the statement in *Weintraub* that neither factor is dispositive.  *Compare Brown v. Office of State Comptroller*, — F. Supp. 3d —, 2016 WL 5745090, at *7 (D. Conn. Sept. 29, 2016) ("After *Weintraub*, the availability of a civilian

analogue was seen as relevant to, but not dispositive of, whether an employee spoke as a citizen. However, the recent decision in *Matthews* [] makes it clear that the existence of a civilian analogue is typically a prerequisite to a holding that the employee was speaking as a citizen." (citations omitted)), *appeal filed*, No. 16-3615 (2d Cir. Oct. 26, 2016), *with Buttaro v. City of New York*, No. 15-CV-5703, 2016 WL 4926179, at *9 n.5 (E.D.N.Y. Sept. 15, 2016) (citing *Weintraub* for the proposition that "the lack of a citizen analogue is not dispositive" and emphasizing that *Matthews* held only that the lack of a civilian analogue "reinforce[d]" the Second Circuit's conclusion that the plaintiff spoke as a citizen (internal quotation marks omitted)), *and McGuire v. City of New York*, No. 12-CV-814, 2015 WL 8489962, at *4 (E.D.N.Y. Dec. 8, 2015) (noting that the "Second Circuit has set forth a number of factors that may guide district courts in conducting this inquiry").

Nothing in *Matthews* suggests that the Second Circuit intended to abrogate the unremarkable comment in *Weintraub* that neither factor is dispositive, or the statement in *Ross* that "[c]ourts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, . . . the relationship between the two[,] . . . . [and] [o]ther contextual factors, such as whether the complaint was also conveyed to the public." 693 F.3d at 306. In clarifying the two factors that courts must consider to determine whether a public employee spoke as a private citizen, the Second Circuit in *Matthews* cited to *Weintraub*, *see* 779 F.3d at 173, and offered no indication that *Weintraub* (or *Ross*) was no longer good law. The Court is therefore not persuaded that *Matthews* made the unavailability of a civilian analogue the dispositive inquiry.

The Court is thus left with the question of whether, considering the content and circumstances of the speech, it can be said that Plaintiff was speaking as a private citizen. On this question, the Court finds it relevant that although it is alleged that Commissioner Hartnett

learned of Plaintiff's comments disapproving of the proposed cuts, (*see* Am. Compl. ¶ 19),

Plaintiff never actually communicated that disapproval to Commissioner Hartnett, raising the

issue only at the Yonkers PBA meeting, (*see id.* ¶¶ 16–17).  While Olson argues that "the

purpose behind [Plaintiff's] speech was not to address matters of public concern, but to address

matters that affected [P]laintiff's ambitions within the [Yonkers] PBA," (Olson's Mem. 13), the

Court is not prepared to speculate at this stage as to Plaintiff's motivations for his conduct.

Nevertheless, that Plaintiff chose to voice his complaints in a nonpublic meeting, to which only

union members were invited, and not to Commissioner Hartnett himself (or any other

Department employee in a supervisory or decisionmaking role) counsels against finding that

Plaintiff acted as a private citizen in voicing his complaints.  *See Harisch v. Goldberg*, No. 14-

CV-9503, 2016 WL 1181711, at *8 (S.D.N.Y. Mar. 25, 2016) ("The secrecy of [the meeting

where the plaintiff spoke], exclusively attended by [t]own employees and dedicated to discussing

other [t]own employees' abuse of [t]own policies, further indicates that the speakers at the

meeting were not speaking as citizens."); *Palmer v. Penfield Cent. Sch. Dist.*, 918 F. Supp. 2d

192, 198 (W.D.N.Y. 2013) ("[E]xpression of one's opinions to 'a limited audience weighs

against a claim of protected speech.'" (alterations omitted) (quoting *Desrochers v. City of San

Bernardino*, 572 F.3d 703, 714 (9th Cir. 2009))

Plaintiff objects that it is clear from the facts alleged that Commissioner Hartnett did, in

fact, know of Plaintiff's concerns.  (*See* Pl.'s Mem. 10–11.)  That is not the inquiry.  In

*Weintraub*, the plaintiff's supervisors knew of the plaintiff's complaints about the

administration—indeed, that case concerned the filing of a grievance through the union, which

was directed at the plaintiff's supervisors.  *See Weintraub*, 593 F.3d at 199.  Still, the Second

Circuit held that there was no civilian analogue because the plaintiff "made an internal

communication pursuant to an existing dispute-resolution policy established by his employer." *Id.* at 204.  It is not dispositive, nor even relevant, that Plaintiff's supervisors learned of his criticisms—the First Amendment does not attach to a public employee's comments made in a closed environment merely because the substance of those comments is subsequently leaked to a superior.  To hold otherwise would suggest that Plaintiff's speech was not protected when he made it, but became protected once Commissioner Hartnett learned of it.  Such a proposition has no basis in the law.

Because Plaintiff's speech lacked any civilian analogue, and because Plaintiff's speech, made behind closed doors outside the presence of both the public and Commissioner Hartnett, was at least tangentially related to his official duties, the Court is persuaded that no First Amendment protection attached to Plaintiff's comments at the two Yonkers PBA meetings. Plaintiff spoke at a closed forum, unavailable to ordinary citizens and made available to him only by virtue of his status as a police officer.  *See Whitehead*, 953 F. Supp. 2d at 376 ("[The] plaintiff's participation in the quota policy arbitration is not protected by the First Amendment because he did not publicly testify and was only able to participate in the arbitration because of his position as a police officer.").  The issues on which he spoke, though not directly related to his official duties, did implicate the exercise of his official duties, and thus, considering the "nature of . . . [P]laintiff's job responsibilities, the nature of the speech, and the relationship between the two," as well as "[o]ther contextual factors," *Ross* 693 F.3d at 306, the Court concludes that Plaintiff was not speaking as a private citizen when he spoke out at the Yonkers PBA meetings.

In opposition, Plaintiff relies almost exclusively on the Second Circuit's decision in *Clue v. Johnson*, 179 F.3d 57 (2d Cir. 1999).  There, the plaintiffs were members of a minority faction

within the union and sought to oust union leadership because of their belief that union leaders were colluding with management. *See id.* at 59. To that end, the plaintiffs (1) handed out leaflets and flyers, (2) distributed a newsletter supporting their cause, and (3) obtained signatures on a petition to recall certain union leaders. *See id.* The plaintiffs filed a claim alleging they were retaliated against for their activities on behalf of the minority faction, and the supervisory defendant sought to avoid liability by arguing that activities on behalf of a minority union faction, rather than on behalf of the union itself, were not protected by the First Amendment. *See id.* at 60. The Second Circuit disagreed, stating that although "[t]here may well be intraunion disputes that do not raise enough of a public concern to trigger First Amendment protection," "activities on behalf of a union faction that necessarily entail a substantial criticism of management raise matters of public concern under *Connick* [*v. Myers*, 461 U.S. 138 (1983)]." *Id.* at 61. Cited by Plaintiff here is the Second Circuit's pronouncement that "[t]here is no doubt that retaliation against public employees solely for their union activities violates the First Amendment." *Id.* at 60.

Plaintiff's reliance on *Clue* is unavailing. At issue in *Clue* was the question of whether the plaintiffs' speech implicated matters of public concern, one of two steps involved in determining whether a public employee spoke as a private citizen on a matter of public concern. *See Matthews*, 779 F.3d at 172. But although Defendants argue that Plaintiff did not speak on a matter of public concern, (*see* City Defs.' Mem. 9–12; Olson Mem. 13–17), a point on which *Clue* is instructive, they also argue, and the Court agrees, *see supra*, that Plaintiff did not speak as a private citizen, obviating any need to even address whether Plaintiff spoke on a matter of public concern. Indeed, the fact that Plaintiff makes no attempt in his briefing to explain why his

speech was made as a private citizen—he does not even cite to *Matthews*—is itself telling of the strength of the Parties' respective positions on this point.

It is no answer to point to *Clue*'s broad language that "[t]here is no doubt that retaliation against public employees solely for their union activities violates the First Amendment."  179 F.3d at 60.  First, *Clue* was decided several years before *Garcetti*, which clarified what is meant when a public employee speaks as a private citizen.  *See Garcetti*, 547 U.S. at 421–22.  And it was not until later, in *Weintraub*, *Jackler*, *Ross*, and *Matthews*, that the Second Circuit offered an interpretation of *Garcetti* and set forth the two-factor test that now controls.  In none of those cases did the Second Circuit suggest that *Clue* carved out an exception to the rule in *Garcetti* for public employees engaging in union activities, and, in fact, the Second Circuit did not even cite to *Clue* in its decision in *Weintraub*, which involved the filing of a grievance through a union.  Second, the Second Circuit has since clarified that, even with respect to the issue of whether a public employee is speaking on a matter of public concern, *Clue* should not be read as broadly as Plaintiff suggests.  *See Lynch*, 811 F.3d at 582 ("Though the court [in *Clue*] said in dicta that 'retaliation solely for union activity clearly raises a public concern under *Connick*,' it obviously did not mean that all activities undertaken through a union necessarily become matters of public concern merely by virtue of their collateral connection to the union." (citation omitted) (quoting *Clue*, 179 F.3d at 61)); *see also Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011) ("A petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context.").

Plaintiff further objects that "[b]y [the] defendants' reasoning, no public employee's union activity would be protected, except for perhaps television appearances and letters to the

editor, because the employee could only be a union member or union official by virtue of his

employment." (Pl.'s Mem. 11.) But Plaintiff's speech is not unprotected merely because it was

made in private, *see Garcetti*, 547 U.S. at 420 ("That [the plaintiff] expressed his views inside

his office, rather than publicly, is not dispositive. Employees in some cases may receive First

Amendment protection for expressions made at work."), rather, it is unprotected because it was

made in a mode for which no civilian analogue exists and it touched, albeit only partially, on

matters related to Plaintiff's official duties as a police officer. Public employees need not seek

out media attention to receive First Amendment protection, but they do need to exercise their

free speech rights in a forum for which a civilian analogue exists. In *Clue*, for instance, the

plaintiffs handed out flyers, distributed a newsletter, and solicited signatures for a petition. 179

F.3d at 59. These actions all have obvious civilian analogues, as any private citizens may hand

out flyers, distribute newsletters, or solicit support for a petition. But where, as here, a public

employee speaks out behind closed doors (closed to the public and to management) on issues

related to their employment, the Second Circuit has indicated that no First Amendment

protection attaches.

      Finally, Plaintiff's complaint that an adverse decision would leave him with no effective

recourse is unpersuasive. If Plaintiff is facing retaliation by a union leader because of comments

made at a union meeting, Congress has already offered protection for such speech. *See* 29

U.S.C. § 411(a)(2) ("Every member of any labor organization shall have the right . . . to express

at meetings of the labor organization his views . . . ."); *see also Maddalone v. Local 17, United

Bhd. of Carpenters*, 152 F.3d 178, 183 (2d Cir. 1998) ("[The Labor Management Reporting and

Disclosure Act] protects a member from being fined, suspended, expelled or 'otherwise

disciplined' for exercising any right guaranteed by [29 U.S.C. § 411] . . . ."). That Plaintiff has

withdrawn his claim under the Labor Management Reporting and Disclosure Act—either for strategic reasons or because he is ineligible for protection by virtue of his expulsion and the state court judgment affirming that expulsion—does not entitle him to additional First Amendment rights.  And if his complaint is that the Yonkers PBA and the Department are so corrupt and mismanaged as to create an unbearable work environment, his recourse is not through § 1983, but through conventional avenues of workplace reconciliation.  *See Rivera v. Brooklyn Hosp. Med. Ctr.*, 28 F. Supp. 3d 159, 162 (E.D.N.Y. 2014) ("[A]n employer has no obligation to insure a pleasant work environment . . . .").

The Court thus concludes that, assuming all factual allegations in the Amended Complaint as true, Plaintiff's comments at the Yonkers PBA meetings were not made in Plaintiff's capacity as a private citizen, and thus were not protected by the First Amendment.[2] Because this issue is dispositive of the case, the Court declines to consider whether Plaintiff spoke on a matter of public concern, whether he suffered an adverse employment action, or whether he has otherwise stated a claim for municipal liability pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).[3]  The Court similarly declines to consider whether the individual Defendants are entitled to qualified immunity.

---

[2] Though Plaintiff argued in his opposition papers only that his comments criticizing management were protected by the First Amendment, the analysis applied above would apply with equal force to those comments made by Plaintiff that were critical of Olson's leadership.

[3] Although the Court has no occasion to weigh in on whether Plaintiff's speech implicated matters of public concern, the allegations in ¶ 15 of the Amended Complaint related to Plaintiff's criticism of Olson's leadership plainly do not implicate a public concern.  *See Heil v. Santoro*, No. 94-CV-9109, 1997 WL 102451, at *4 (S.D.N.Y. Feb. 28, 1997) ("A public employee's speech on matters of purely personal or internal office affairs does not constitute a matter of public concern and is therefore not entitled to constitutional protection."); *see also Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008) ("The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" (quoting *Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir. 1999)).  Whether the allegations in ¶¶ 16 and 17, discussing Plaintiff's opposition to cuts that were

C.  Dismissal With Prejudice

A complaint should be dismissed without prejudice if the pleading, "'liberally read,'
suggests that the plaintiff has a claim that [s]he has inadequately or inartfully pleaded and that
[s]he should therefore be given a chance to reframe." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d
Cir. 2000) (alterations and citation omitted) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d
794, 795 (2d Cir. 1999)).  If a complaint, however, has substantive problems and "[a] better
pleading will not cure [them]," "[s]uch a futile request to replead should be denied." *Id.* (citing
*Hunt v. All. N. Am. Gov't Income Tr.*, 159 F.3d 723, 728 (2d Cir. 1998)).  Courts are especially
wary of giving plaintiffs multiple "bites at the apple" where a plaintiff has already been granted
leave to amend.  *See Anthony v. Brockway*, No. 15-CV-451, 2015 WL 5773402, at *3 (N.D.N.Y.
Sept. 30, 2015) ([The] [p]laintiff has already been given one opportunity to amend his complaint
. . . , and there is nothing in his second amended complaint suggesting that [he] could do better
given another opportunity."); *Al-Qadaffi v. Servs. for the Underserved (SUS)*, No. 13-CV-8193,
2015 WL 585801, at *8 (S.D.N.Y. Jan. 30, 2015) (denying leave to amend where "[the plaintiff]
has already had one chance to amend his [c]omplaint, and there is still no indication that a valid
claim might be stated if given a second chance"), *aff'd*, 632 F. App'x 31 (2d Cir. 2016); *Bui v.
Indus. Enters. of Am., Inc.*, 594 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) (dismissing an amended
complaint with prejudice where the plaintiff failed to cure the deficiencies identified in his initial
complaint despite "being given ample opportunity to do so").

Here, Plaintiff has already amended his Complaint.  There is no reason to suspect that,
given another opportunity to amend, Plaintiff will be able to cure the substantive deficiencies

---

allegedly "bad for the community," implicate a public concern presents a closer question that
need not be confronted here.

here. Plaintiff's counsel admitted as much at oral argument, conceding that Plaintiff was already on his second complaint and that a second amendment would this far into the case would be unusual. The Court also finds it relevant that Plaintiff, in filing his Amended Complaint, removed factual detail from the original Complaint. (*Compare* Compl., *with* Am. Compl.) To allow Plaintiff to now go back yet again and reinsert or add factual material that, in Plaintiff's judgment, was not appropriate for inclusion in the Amended Complaint would give too much leeway to a party who, represented by able counsel, has never expressed before that another amendment was needed. Moreover, when pressed at oral argument as to what other protected statements ¶ 15 of the Amended Complaint may allude, Plaintiff's counsel could not adduce a single example of protected speech that could have been, but was not, pleaded in the Amended Complaint. In such circumstances, the Court is not inclined to give Plaintiff yet another bite at the burrito. Dismissal is therefore with prejudice.

## III. Conclusion

For the foregoing reasons, the Motion is granted with prejudice. The Clerk of Court is respectfully requested to terminate the pending Motions (Dkt. Nos. 26, 29) and close the case.

SO ORDERED.

DATED: December 20, 2016
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

29